UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CENTRO DE LA COMUNIDAD HISPANA
DE LOCUST VALLEY; and THE
WORKPLACE PROJECT,                                           **MEMORANDUM & ORDER**

                 Plaintiffs,          10-CV-2262 (DRH)

     -against-


TOWN OF OYSTER BAY; JOHN
VENDITTO, Town Supervisor of the Town
of Oyster Bay,
                Defendants.
--------------------------------------------------------X

**APPEARANCES:**

**For the Plaintiffs:**
**LATINOJUSTICE PRLDEF**
99 Hudson Street, 14th Floor
New York, New York 10013
By:    Alan Levine, Esq.
        Elizabeth Joynes, Esq.
        Jackson Chin, Esq.

**NEW YORK CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 19th Floor
New York, New York 10004
By:    Corey Stoughton, Esq.
        Arthur Eisenberg, Esq.
        Jordan S. Wells, Esq.

**For the Defendants:**
**SINNREICH KOSAKOFF & MESSINA LLP**
267 Carleton Avenue, Suite 301
Central Islip, New York 11722
By:    Jonathan H. Sinnreich, Esq.
        Timothy F. Hill, Esq.

**GOLDBERG SEGALLA LLP**
100 Garden City Plaza, Suite 225
Garden City, New York 11530
By:    Christopher Kendric, Esq.

**HURLEY, Senior District Judge:**

In 2009, the Town of Oyster Bay passed an ordinance prohibiting persons standing within or near a public right-of-way from stopping or attempting to stop vehicles to solicit work, and drivers from stopping to solicit employees or accept a solicitation of employment. On May 18, 2010, plaintiffs Centro De La Comunidad Hispana De Locust Valley ("Centro") and the Workplace Project ("Workplace") (collectively "Plaintiffs") commenced this action against defendants Town of Oyster Bay (the "Town") and John Venditto ("Venditto"), its Supervisor, (collectively "Defendants") challenging the ordinance on various constitutional grounds. Presently before the Court is Plaintiffs' motion for summary judgment to permanently enjoin the ordinance from going into effect as unconstitutional. The motion is granted because, as explained *infra*, the Ordinance suffers from constitutional overbreadth.

## BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions and are undisputed unless otherwise noted.

## I.     The Ordinance and its Terms

On September 29, 2009, the Town enacted the ordinance at issue in this case, Chapter 205-32 of the Code of the Town of Oyster Bay, Solicitation from Streets and Sidewalks Prohibited (the "Ordinance"). The Ordinance reads as follows:

A.     Legislative intent.

It is the intention of the Town Board to protect the health, safety and welfare of motorists and pedestrians using public rights-of-way within the Town of Oyster Bay, and persons standing in close proximity to said public rights-of-way, from the dangers of obstruction, distraction and delays of traffic caused by the solicitation of employment by pedestrians from or directed to operators or occupants of motor vehicles while utilizing the Town's public rights-of-way, or by the offer of employment to pedestrians by the operators or occupants of motor vehicles while utilizing the Town's public rights-of-way.

B.     Definitions.

EMPLOYMENT - Services, industry or labor performed by a person for wages or other compensation under any contract of hire, written or oral, express or implied.

PERSON - Any individual, company, corporation, association, business or legal entity.

PUBLIC RIGHT-OF WAY - All of the areas dedicated to public use for public street purposes and shall include roadways, parkways, highways, streets, medians, sidewalks, curbs, slopes and areas of land between the sidewalk and the curb which are also known as utility strips, except for lawful public parking areas.

SOLICIT OR SOLICITATION - Any request, offer, enticement, or action which announces the availability for or of employment, or a request, offer, enticement, or action which seeks to offer or secure employment. Examples of behavior which constitute solicitation of employment include but are not limited to waving arms, making hand signals, shouting to someone in a vehicle, jumping up and down, waving signs soliciting employment pointed at persons in vehicles, approaching vehicles, standing in the public right-of-way while facing vehicles in the roadway, or entering the roadway portion of a public right-of-way for purpose of seeking

employment. A solicitation shall be deemed complete when made whether or not an employment relationship is created, a transaction is completed or an exchange of money or property takes place.

C.     It shall be unlawful for any person standing within or adjacent to any public right-of-way within the Town of Oyster Bay to stop or attempt to stop any motor vehicle utilizing said public right-of-way for the purpose of soliciting employment of any kind from the occupants of said motor vehicle.

D.     It shall be unlawful for the operator of any motor vehicle utilizing a public right-of-way within the Town of Oyster Bay to stop or stand within or adjacent to said public right-of-way or any area designated as either a traffic lane or a no standing or stopping zone for the purpose of soliciting employment or accepting a solicitation of employment from a pedestrian.

E.     Nothing contained herein shall be construed to prohibit the following:

(1)     Service related activities such as taxicabs, limousine service, public transportation vehicles, towing operations, ambulance service and similar uses.

(2)     Nothing shall prohibit a business or property owner from soliciting employment at or upon the property owner's private property, provided however that automobiles, recreational vehicles, trailers, trucks and other vehicles do not constitute a business property exempt from the provisions of this act.

F.     Penalties for Offenses.

(1)     Any violation of this section is punishable by a fine of not more that $250.00 for each offense.

[Levine Decl. Ex. 1.]

## II.     Events Leading Up to the Adoption of the Ordinance

It is undisputed that for several years prior to the passage of the Ordinance,

day laborers have gathered in the Town of Oyster Bay along a four block stretch of

Forest Avenue in Locust Valley between Tenth and Fourteenth Streets, but

particularly at the intersections of Forest Avenue with Twelfth and Thirteenth

Streets.  [Defs. 56.1 at ¶88.]  Forest Avenue is a two lane road, running east-west

through the hamlet of Locust Valley, with a parking lane on the north side of the

road adjacent to the westbound traffic lane.  [*Id.* at ¶¶3, 4.] The number of day

laborers  on Forest Avenue varies with the season and time of day; typically there is

between 20 and 30 day laborers although the number has reached as high as 50 at a

time. [*Id.* at ¶ 92.]

The Town of Oyster Bay held a Town Board meeting on March 31, 2009.

According to the minutes of that meeting, during the public comment portion some

members of the public, including residents of Locust Valley and the Town of Oyster

Bay, commented on the impact of day laborers soliciting work on Forest Avenue.

[Levine Declar. Ex. 2 at 11, Stip. of Fact 7;  Levine Declar. Ex. 14.]  One member of

the public commented that day laborers urinate and defecate on the property, make

it impossible to walk on the sidewalks, are unsafe and unsightly, and chase cars

down the street thinking they contain potential employers.  [Levine Declar. Ex. 14.]

Another stated that contractors are stopping to pick up the day laborers and

causing traffic to back-up.  [*Id.*] Another recounted how his nine year old son takes

the bus to school and is constantly moving from street to street to avoid day laborers. [*Id*.]

On May 26, 2009, the Town held a public hearing on a proposed ordinance to address the issue of day laborers and employers along Forest Avenue. [Levine Declar. Ex. 2 at 11, Stip. of Fact 8; Levine Declar. Ex. 15.] As evidenced by the transcript of the hearing, residents spoke both for and against the ordinance. [Levine Declar. Ex. 15 *passim*.] Some residents complained that day laborers caused traffic problems and interfered with families walking down the street to go to school bus stops and otherwise walking on the streets. [*Id*. at 21, 42, 60-62, 65, 94] Other residents, as well as Supervisor Venditto, commented about day laborers being undocumented. [*Id. passim*.]

Prior to the enactment of the Ordinance, although the exact time frame is unclear, Justin McCaffrey ("McCaffrey"), the Town's Commissioner of the Department of Public Safety,[1] visited the Forest Avenue shape-up site[2] between 15 and 20 times to observe the conditions and activities taking place there. [Sinnreich Declar. Ex. C at ¶4.] Although he visited the location at different times of day, he concentrated his visits in the morning hours, remaining in place for a period up to 20 minutes, as well as driving by periodically during the day. [*Id*.] According to

---

[1] The Department of Public Safety, through it Public Safety Officers, enforces the Town of Oyster Bay's Code. [Def. 56.1 at ¶ 25.]

[2] "Shape-up site" is a term used to refer to informal hiring sites, often located on busy streets or in front of home improvement stores and gas stations, at which day laborers search for work. *See* discussion at p. 9 *infra*.

McCaffrey, what he observed was "the daily operation of an organized outdoor labor market" - organized in the sense that "it was clear that this 'shape-up' site was an established and pre-arranged location for the meeting up of large numbers of day laborers seeking casual employment, and potential employers of such individuals." [*Id*. at ¶5; *see also* Sinnreich Decl.*,* Ex. D (Maglio Aff.) at ¶4.]   While the number of individuals varied with the season and time of day, he observed in excess of 20 to 30 individuals at one time, reaching a peak of approximately 50.  The majority of these individuals congregated at the street corners of the northerly intersection of 12th and 13th streets with Forest Avenue.  [Sinnreich Declar. Ex. C at ¶6i.]   He "observed situations where, because of the large number of such individuals crowding at the street corners blocking the drivers' line of sight, drivers attempting to exit from the side streets onto Forest Avenue had to inch out their vehicles in order to attempt the turn onto Forest Avenue, often having to nose out all the way into the moving traffic lanes before they could safely navigate a turn." [*Id*. at ¶6ii; *see also* Sinnreich Decl.*,* Ex. D (Maglio Aff.) at ¶6ii.]   He also saw "numerous instances of vehicles slowing down and stopping in the moving traffic lanes of Forest Avenue in order to engage day laborers in extended discussions, usually at the drivers' window."  [Sinnreich Declar. Ex. C at ¶6iii; *see also* Sinnreich Decl. Ex. D (Maglio Aff.) at ¶6v.]  Vehicles stuck behind these stopped vehicles would pass them by crossing the double center line and driving in the oncoming traffic lane, or would back up to obtain clearance to drive around them.  [Sinnreich Declar. Ex. C at ¶6iii.]  At times, "20 to 30 day laborers, or more" would "swarm out" on Forest

Avenue, as well as the side streets and "surround stopped vehicles [both double parked and lawfully parked] for purposes of soliciting employment." [*Id.* at ¶6 iv, vii; *see also* Sinnreich Decl. Ex. D (Maglio Aff.) at ¶6iii.] Other times, school buses were impeded by the presence of stopped vehicles. [Sinnreich Declar. Ex. C at¶6v.] McCaffrey also observed issues related to pedestrian traffic caused by the large number of day laborers on the sidewalks. For example, pedestrians attempting to navigate the sidewalks would exit the walkway onto the road to avoid the crowds. [*Id.* at 6xi.]

On September 29, 2009, the Town Board unanimously adopted the Ordinance. It has not, however, actually been enforced. Initially, enforcement was delayed "so that the Town could engage in a public education campaign to alert the local community and the participants of the 'shape-up' site of the prohibitions contained in the new ordinance." [*Id.* at ¶10.] Thereafter and before it could be enforced, enforcement was stayed by virtue of the temporary restraining order and later preliminary injunction issued by this Court.

## III.  Day Laborers

While Defendants disputes the identity, countries of origin, ethnic identities and immigration status of the day laborers in the Town of Oyster Bay as "inadmissible hearsay" and because of the limitation placed on Defendants' discovery [Defs. 56.1 Statement at ¶¶ 5-6], Defendants have themselves proffered "papers and/or reports" containing information regarding, *inter alia,* the ethnic

identities, immigration status and countries of origin of day laborers. [*See* Sinnreich Declar. Exs. B and L.]  It is from these reports, that the following information is derived.

While statistics vary and, due to the nature of day labor, are difficult to garner, one report estimates that on any given day more than 100,000 workers are either looking for day labor jobs or working as day laborers, [Abel Valenzuela Jr. Et Al., On The Corner: Day Labor in the United States at  1, 4  (2006), http:www.sscnet.ucla.edu/issr/csup/uploaded_files/Natl_DayLabor-On_the_Corner1.pdf  (Sinnreich Declar. Ex. L) (hereinafter "On the Corner")], while another estimates the number at 260,000, [Rob T. Guerette, The Problem of Disorder at Day Laborer Sites at 7 (Sinnreich Declar. Ex. L.) (hereinafter "Disorder at Day Laborer Sites"]. The day labor market is fluid one.  "On a daily basis new workers enter this market while other leave it. Similarly hiring sites diminish in size or disappear while new ones emerge."  [On the Corner at 1, 4.]  Although some day laborers use day labor work centers operated as formalized hiring halls by entities such community organizations or municipal governments, the vast majority of day laborers search for work at informal hiring sites, sometimes referred to as "shape-up" sites, located on busy streets or in front of home improvement stores, businesses, or gas stations.  [*Id*. at 4.]   Day labor sites are spot markets where workers and employers meet to negotiate employment and the terms thereof.  [*Id*. at 1.]

Day laborers perform different types of manual labor jobs such as painting,

construction, roofing and landscaping.  They are usually hired by contractors or homeowners.  [*Id*. at 9;  Abel Valenzuela Jr. & Edwin Melendez, <u>Day Labor In New York: Findings from the NYDL Survey</u> at 9-10 (2003), http://www.sscnet.ucla.edu/issr/csup/pubs/papers/pdf/csup3_NYDLS.pdf (Ex. L to Sinnreich Declar) (hereinafter "<u>Day Labor in NY</u>").] A majority of day laborers (83%) rely on day labor work as their only source of income, with most (70%) searching for work five or more days a week.  [<u>On the Corner</u> at 9; *see* <u>Day Labor in NY</u> at 9 ("The majority of day laborers look for work Monday through Sunday. Twenty-one percent only look for work on the weekdays[;] 17 percent of day laborers surveyed reported that they had a job other than seeking work as a [day laborer]. Of those who have another job, over 60 percent work more than 20 hours a week with mean hours worked totaling 27 hours.  When asked whether they would prefer to work as a day laborer instead of having a permanent job, an overwhelming majority (81%) said they would prefer to have a permanent job.")]  For some, work in the day labor market is brief; for others it is a long term source of employment:

> A large share of the day labor workforce (44 percent) has participated in this market for less than one year, 30 percent has been in this market for one to three years and 26 percent has been in this market for more than three years. . . . Short-term employment (less than one year) in this market suggests that a substantial share of day laborers are able to make the transition out of the day labor market, presumably to better-paying, more stable employment.  For 60 percent of day laborers, this work was the first occupation that they had in the United States, meaning that for many workers, day labor is the entry point into the U.S. labor market.

[On the Corner at 20; *see* Day Labor in NY at 9 ("Day labor may be perceived as a stepping stone to better employment opportunities or as temporary holdover from a firing, layoff or other work interruption. . . . [W]hile a large majority of day laborers [45%] have been doing this type of work for less than a year, a small minority (16 percent) has been working as day laborers for over four years.")]  Among the most cited reasons preventing a day labor from getting a job in the formal economy are "lack of English proficiency [34.7%], lack of documents [31.3%], and because there are few jobs available [19.1%] or because available jobs pay poorly [12.2%]."  [Day Labor in NY at 9; *see also id*. at 7 ("daily cash payments and non-payment of taxes" proves advantageous to day laborers when compared to minium wage employment.)]

> Most day laborers hope to make the transition out of this sector into stable and better paying jobs.  The overwhelming majority of day laborers (86 percent) are seeking regular, permanent employment.  One in six (17 percent) day laborers currently has another job in addition to participating in the day labor market, though most of these jobs are low paying. . . . This likely reflects the need to supplement low earnings generated by day labor.  It is also possible that day laborers who are able to make the transition out of this market do so by holding multiple jobs before leaving the day labor market entirely.  For others the more typical pattern may be to move in and out of standard employment arrangements in the mainstream economy and in and out of the day labor market.

[On the Corner at 20.]

The overwhelming majority of day laborers are male Latino immigrants

although the percentage of United States born day labor is estimated at between 3 and 7 percent. [Day Labor in NY at 5; on the Corner at 18; *see also* Gregory M. Maney, et al, Protecting Human Rights In a Global Economy: The Impact of Government Responses to Day Labor Markets at 5 (2006) (Levine Declar. Ex. 12) ("Our research indicates that those participating in day labor markets on Long Island were born mainly in Mexico, El Salvador, Honduras, Guatemala, and Ecuador."); Levine Declar. Ex. 8.] According to one study "[t]hree quarters of the day labor workforce are undocumented migrants. However, about 11 percent of the undocumented day labor workforce has a pending application for an adjustment of their immigration status." [On the Corner at 18; *see* Day Labor in NY at 2 ("many workers, including non-immigrants and U.S. citizens" rely on the day labor) and at 5 ("[D]ay laborers vary in legal status. For example 3.1% are U.S. born. Almost 16% had documents when they first entered the U.S. Finally, more than a third believed they qualify for permanent residency - of those 32% intend to apply for permanent residency.").]

Day laborers "range in age from 18 to 64 and on average comprise a relatively young workforce with a mean age of 32." [Day Labor in NY at 5.] Their level of education is mixed. "At one end of the spectrum, more than half either have one to six years of education or none whatsoever. At the other end, more than 30 percent have more than ten years of education, with the mean number of years of education slightly less than eight." [*Id.*]

Additional facts, both contested and uncontested, proffered as relevant to the issues at hand will be discussed as appropriate in the context of the issues themselves.[3]

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material : "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the

---

[3] Defendants' memorandum spends several pages discussing the failure of employers who engaged day laborers  at the Locust Valley shape-up site to comply with required federal employment verification procedures, federal and state income tax reporting procedures and applicable New York State Labor law requirements, information apparently garnered during discovery in this case, viz. employer depositions.  However, those depositions have not been submitted to the Court. Additionally, Defendants' memorandum references  a "Marcum Advisory Group Report" that was not submitted.  Accordingly, these materials cannot be considered.

non-movant's favor. *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012; *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French,* 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d

Cir. 1988).  Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim.  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11).  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).  "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000); *see Edenfeld v. Fane*, 507 U.S. 761, 770 (1993) ("The party seeking to uphold a restriction on commercial speech carries the burden of justifying it.").  Thus, in this case, the burden is on the Defendants to offer sufficient evidence that there *is* a genuine issue of material fact to be tried as to the constitutionality of the Ordinance.

## II.    Standing

The Court shall first address the threshold matter of standing. *See, e.g.,*

*Denney v. Deutsche Bank AGI*, 433 F.3d 253, 263 (2d Cir. 2006). Specifically, the Court will address whether Workplace has standing. Although the parties also address the issue of Centro's standing in their submissions on this motion, the Court has already held that "Centro has standing to bring this action in its own right to seek judicial relief because the Town's ordinance imposes a threat of injury to Centro's organizational activities and goals." [Mem. & Order, dated June 18, 2013, (DE 94) at 8.] Nothing in the instant motion convinces the Court that its earlier ruling as to Centro was erroneous or should be revisited and accordingly that determination is incorporated by reference.

A.  **Facts Relevant to Workplace's Standing**

Workplace is an unincorporated membership organization based in Hempstead, New York whose mission is to "end the exploitation of Latino immigrant workers on Long Island and to achieve socioeconomic justice by promoting the full political, economic and cultural participation of those workers in the communities in which they live." [Def. 56.1 at ¶¶ 72-73.] Through its Day Laborer's initiative, it "organizes day laborers and community members to 'come together to create better working conditions and to advocate for government policies that will respect the rights of day laborers to seek work in peace.' " [*Id*. at ¶ 75.] Workplace has a day laborer project organizer who travels to day labor sites in Nassau and Suffolk counties, including in the Town of Oyster Bay, speaking with day laborers about their rights and supporting day laborers facing unpaid wages. [*Id*. at ¶ 76; Levine Declar. Ex. 28 (Marin Dep.) at 30-31.] According to the

Executive Director of Workplace, the Ordinance will impact some of Workplace's public protest activities as it "engages in speech in public places that 'relates to the ability of day laborers to obtain to secure employment.' " [Def. 56.1 at ¶83.] Its protesters usually carry signs meant to be read by the public, including those in passing vehicles. It also distributes flyers and leaflets about matters relating to securing and protecting employment for day laborers. [*Id*. ¶¶84-85.] Workplace believes that some of its advocacy activities in public spaces will be confused with soliciting employment in violation of the Ordinance. [*Id*. ¶87.] In addition, Workplace has had to use it resources, including staff time, to understanding the ordinance and supporting plaintiff Centro in this litigation. [Levine Ex. 28 at 46:12-47:6]

### B.     Analysis

In order to satisfy the case or controversy requirement of Article III of the Constitution, a plaintiff must establish standing. *See* U.S. CONST. art. III, § 2, cl. 1. Standing requires a plaintiff to "allege personal injury traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). In addition, the injury must be concrete and particularized, not merely conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

An organization can obtain standing in two ways. First, an organization may "have standing in its own right to seek judicial relief from injury to itself and to

vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Under this theory, "the organization is just another person - albeit a legal person - seeking to vindicate a right." *N. Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294-95 (2d Cir. 2012) (finding that the organization had standing to "vindicate its own rights as an organization with goals and projects of its own"). As a result, "[l]ike the individual plaintiff, an organization must show actual or threatened injury in fact that is 'fairly traceable to the alleged action and likely to be redressed by a favorable court decision.'" *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904 (2d Cir. 1993) (internal citation omitted). Second, an organization may sue on behalf of its members by demonstrating that "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action." *Warth*, 422 U.S. at 511.[4]

The Second Circuit has recognized that when analyzing whether an organization has standing to sue in its own right "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin*, 6 F.3d at 905 (2d Cir. 1993) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982))). Moreover, the Second Circuit has recognized that an

---

[4] As the Second Circuit has held that organizations lack standing to assert §1983 claims on behalf of their members, *see Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011); *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973), the Court has limited its discussion to the question of whether Workplace has standing in its own right.

organization has standing to sue in its own right as an organization with "goals and projects of its own." *New York Civil Liberties*, 684 F.3d at 295 (finding that NYCLU had a "cognizable interest" in open access to hearings before the Transit Authority "as a matter of professional responsibility to clients" and that denying the NYCLU access to these hearings had "impeded, and will continue to impede, the organization's ability to carry out this aforementioned responsibility").

Like Centro, Workplace has established the "perceptible impairment" to its activities required to constitute standing in its own right. Workplace is concerned that some of its advocacy activities in public spaces will be confused with soliciting employment in violation of the Ordinance. Given the testimony that it is difficult to distinguish someone standing on the sidewalk soliciting employment from someone gathered to provide information to day laborers [*see* Levine Declar. Ex. 13 at 137], it is perceptible that enforcement of the Ordinance would prevent Workplace from engaging in counseling at shape-up sites within the Town and thus impair its advocacy activities. Moreover, this impairment is to a "cognizable interest" as the counseling that Workplace provides is integral to its mission to "organiz[e] day laborers to create better working conditions" and "advocate for government that will respect the rights of day laborers to seek work in peace." *Cf. Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (anti-solicitation ordinance frustrated plaintiff organization's mission to strengthen the work of day laborer organizing groups by discouraging "both employees and employers from participating in hiring transactions.")

Having determined the standing issue, the Court will now address another preliminary issue - Defendants' Due Process claim.

## III.    Defendants' Due Process Claim

According to Defendants, "[t]his motion should be denied because, as a result of this Court's Order dated June 19, 2013 [ECF No. 94] granting plaintiffs' application for a protective order prohibiting defendants from obtaining discovery from or pertaining to the so-called 'members' of the plaintiff organizations, i.e. the day laborers themselves whose conduct is at the heart of this action, defendants have been denied a full and fair opportunity to obtain critical evidence material and necessary to defend this case" and "to grant this motion in the face of such an incomplete record would constitute a fundamental denial of due process." [Defs. Mem. in Opp. at 18.]  Specifically, Defendants assert that "the day laborers themselves are clearly the single most knowledgeable potential witnesses concerning virtually all of the material facts at issue, particularly with respect to the legal defenses asserted by defendants."  [*Id*. at 19.]  Defendants identify those facts as including "the extent to which they were indeed responsible for the full range of dangerous, unlawful and unhygienic conduct described by the Town's witnesses" and "their supposed membership in the plaintiff organizations, their immigrant and employment status and their compliance or non-compliance, with applicable tax laws."  [*Id.*]

In its Memorandum and Order dated June 18, 2013, the Court, having heard the arguments of both sides, held that the Plaintiffs had made a sufficient showing

that there is a reasonable probability that compelled disclosure of Plaintiffs'
members and other day laborers known to them would infringe associational rights
and could lead to threats or harassment and that Defendants had not shown a
compelling need for the discovery. [Mem. & Order at 16-25.] That decision is
incorporated by reference. Given the bases for that decision, Defendants' claim that
they have been denied due process falls short of being convincing. Moreover, it
warrants mention that Defendants have submitted generic information on the
immigration and employment status of day laborers and their common non-
compliance with applicable tax laws [*see* Sinnreich Declar. Exs. B & L], which the
Court has accepted for present purposes as accurate. Defendants have also
submitted first hand accounts of the actions and impact of day laborers at the
Forest Avenue site [*see*, *e.g.*, Sinnreich Declar. Ex. C at ¶6 & Ex. D ¶6.]. Which is
to say that even if the Court's June 28, 2013 Order was erroneous as Defendants
contend, Defendants' ability to proffer this evidence (and assuming, arguendo, its
relevance) belies any claim that the limitation on discovery somehow constituted a
denial of Due Process.

Having addressed all the preliminary matters, the Court now turns to the
heart of the controversy before it: Does the Ordinance withstand constitutional
scrutiny?

## IV.    The First Amendment Challenge

### A.    <u>The Parties' Contentions</u>

Plaintiffs maintain that the Ordinance must be stricken as violative of the

First Amendment.  First, it is a content-based enactment, presumptively
unconstitutional and not justified as narrowly tailored to serve a compelling state
interest.  Second, if viewed as a "time, place or manner restriction" and not content-
based, it is not narrowly tailored  to serve "legitimate, content-neutral interest."
Third, even if viewed as restricting purely commercial speech, it is not narrowly
tailored.

Defendants offer several arguments in response.  First, the Ordinance does
not affect expressive speech; rather, it regulates conduct.  Second, day labor
solicitation is commercial speech.  As such, it is entitled to no protection because it
relates to illegal activity; alternatively, the ordinance is a constitutional restriction
of commercial speech.  Finally, to the extent it is viewed as a time, place or manner
restriction, it is narrowly tailored.

**B.**    **Overview of Discussion**

The Court's discussion shall proceed in the following manner.  First, the
Court will analyze whether the Ordinance regulates only conduct.  Next, the Court
will address whether the speech is commercial speech and then whether it is
content based.  Finally, having concluded that the Ordinance is content based and
regulates commercial speech, the Court will evaluate the constitutionality of the
Ordinance.

**C.**    **The Ordinance Regulates Speech**

Defendants maintain that the Ordinance restricts conduct, to wit: stopping or
attempting to stop a vehicle, and not speech and therefore is not subject to the

22

strictures of the First Amendment. The fallacy with this position is that the Ordinance does not simply prohibit conduct, i.e. stopping or attempting to stop a motor vehicle. Rather, it prohibits stopping or attempting to stop a motor vehicle for the purpose of soliciting employment of any kind. Solicit or solicitation is defined as "any request, offer, enticement, or action which announces the availability for or of employment or . . . which seeks to offer or secure employment." In other words, the Ordinance does not merely regulate conduct, it regulates both "speech as well as conduct of a communicative nature." *Loper v. New York City Police Dept.*, 999 F.2d 699, 702 (2d Cir. 1993); *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) ("Speech may include expressive conduct."); *cf. Sorrell v. IMS Health Inc.*, – U.S. –, 131 S. Ct. 2653, 2667 (the dissemination of information is speech); *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) ("minimal information, conveyed in the context of a proposal of a commercial transaction, suffices to invoke the protections of commercial speech").

"To qualify as a regulation of communicative action," the regulation "must be unrelated to expression." *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 567 (2001): *cf. Linmark Assoc. v. Township of Willingboro*, 431 U.S. 85 (1977) (ordinance banning the posting of "for sale" signs subject to First Amendment scrutiny). The Ordinance does not prohibit just any stopping or attempting to stop a vehicle. Its prohibition reaches that conduct only when accompanied by an expression of the availability of a job or of a person for employment, i.e. it is not unrelated to

expression.

### D. The Speech Regulated is Commercial Speech

The "core notion" of commercial speech includes "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66 (1983). Where speech combines both commercial and noncommercial elements, factors such as "whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication" should be examined in determining whether the speech should be treated as commercial speech. *Bad Frog Brewery,* 134 F.3d at 96. While no one factor is determinative, "strong support" for such a conclusion exists when all three factors are present. *Bolger*, 463 U.S. at 66-67; *Bad Frog Brewery*, 134 F.3d at 96.

Measured against the three factors identified in *Bolger*, the solicitation of employment is commercial speech. The solicitation is an advertisement of a specific product, i.e., the availability of the day laborer for work and the availability of a job by vehicle operators. Moreover, both the day laborer and the vehicle operator have an economic motivation - the day laborer to make money and the vehicle operator to secure labor at a low cost. Given the presence of all three *Bolger* factors, the speech at issue is commercial speech.

Relying on *Loper v. New York City Police Dept.*, 999 F.2d 699 (2d Cir. 1993), Plaintiffs argue that the Ordinance proscribes political speech and thus must serve

a compelling state interest and be narrowly drawn to achieve that end. In *Loper*, the Second Circuit in analyzing whether begging constitute a form of expression protected by the First Amendment observed that "[e]ven without particularized speech . . . the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance." *Id.* at 704. Analogizing the present situation to *Loper* , Plaintiffs maintain: "When day laborers gather on the sidewalks of Oyster Bay and many other communities, they . . . communicate an unmistakable sociological truth to a wider community that extends beyond the potential employer. They convey the message that there are many workers in this country without the economic stability provided by secure jobs and that these individuals are left to cobble together livelihoods through piecemeal employment on a day-by-day basis." [Pls. Mem. at 16.]

While *Loper* is instructive on the extent to which conduct can constitute speech, it provides little support for concluding that day laborers' solicitation of employment should be analyzed as anything other than commercial speech. While begging may entail an economic motive, it neither constitutes an advertisement nor identifies a product. And while day laborers may convey the message proffered by Plaintiffs when they solicit work from the side of the road, the primary purpose of the speech the Ordinance regulates is to advertise the day labor's availability for employment and negotiate its terms. "[C]onversations relating to employment constitute commercial speech." *Pittsburgh Press Co. v. Pittsburgh Comm'n on*

*Human Relations*, 413 U.S. 376, 385 (1973); *see also Bolger*, 463 U.S. at 68 ("advertising which links a product to current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech").[5]

###  E.    Governing Standard

As the Ordinance regulates commercial speech, its constitutionality is governed by the four prong test set forth in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557 (1980).  First, for commercial speech to merit First Amendment protection it "must concern lawful activity and not be misleading."  Second, the government must assert a substantial interest to be achieved by the restriction.  If both these conditions are met, a court must go on to examine whether the regulation (1) directly advances the governmental interest asserted" and (2) "is not more extensive than necessary to serve that interest."  *Id.* at 563-66.  In *Sorrell v. IMS Health Inc.,* – U.S. – , 131 S. Ct. 2653 (2011), the Supreme Court couched *Central Hudson's* fourth prong  for restrictions on commercial speech that are content based as requiring that "the [government] must show at least that the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest."  131 S. Ct. at 2667-68.

Parenthetically, the Court notes that, as stated earlier, "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it."

---

[5] In any event, because the Court concludes that the Ordinance does not pass constitutional muster under the *Central Hudson* test it certainly cannot survive a higher level of scrutiny.

*Edenfeld v. Fane*, 507 U.S. 761, 770 (1993); *see United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.")

As adjusted by *Sorrell*, the *Central Hudson* test requires the Court to determine if the Ordinance is content based. It is to that issue the Court now turns.

## E.    The Ordinance is Content Based

*Reed v. Town of Gilbert*, – U.S. –, 135 S. Ct. 2218 (2015) recently enunciated the test for content based regulations as follows:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. . . . This commonsense meaning of the phrase content based requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys. . . . Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys . . . .
> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech or that were adopted by the government because of disagreement with the message that the speech conveys . . . .

— U.S. at —, 135 S. Ct. at 2227 (internal citations and quotation marks omitted); *see also McCullen v. Coakley*, –U.S.–, 134 S. Ct. 2518, 2531 (2014) ("The Act would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred.") (internal

quotation marks omitted).

On its face, the Ordinance is content based. It is addressed to only one type of speech, viz. the roadside solicitation of employment and does not address other types of roadside solicitation or nonsolicitation speech. *Cf. Comite De Jornaleros De Redondo v. City of Redondo Beach*, 657 F.3d 936, 953 (9th Cir. 2011) (Gould, C.J. concurring) ("[T]he Ordinance is facially content based: some solicitation speech is permitted and other solicitation speech is restricted.") Indeed, the stated purpose of the Ordinance - to address "traffic caused by the solicitation of employment" confirms it is content based. *See Sorrell*, 131 S. Ct. at 2663 (in determining if it is content based "a statute's stated purpose may also be considered"). Moreover, in order to determine whether a violation has occurred, the Town's enforcement authorities have to determine that the person stopping or attempting to stop the vehicle did so "for the purpose of soliciting employment." In other words, they have to examine the content of the message conveyed. Having determined that the ordinance is content-based, the Court now proceeds to the first prong of the *Central Hudson* test.

### F. Application of the *Central Hudson* Test

#### 1. The Speech Concerns Lawful Activity

Defendants argue that the speech at issue is not entitled to First Amendment protection "and may be freely regulated by the government or banned altogether" because it relates to an unlawful activity. As enunciated by Defendants, "the entire operation of the Locust Valley 'shape-up' site, including but not limited to the

28

participation of the day laborers was unlawful *per se*" and "each and every one of the resulting employment transactions" was "suffused with unlawful conduct" including income tax evasion, and violations of immigration and workers' compensation laws. Defs. Opp. Mem. at 28-31. It is to this issue the Court now turns.

In *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973), the Supreme Court held that a municipal ordinance prohibiting newspapers from publishing gender designated "help-wanted" advertising columns passed constitutional muster, i.e., did not violate the publisher's rights under the First Amendment. Following is the relevant excerpt from that opinion:

> Discrimination in employment is not only commercial activity, it is illegal commercial activity under the Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns caption 'Narcotics for Sale' and 'Prostitutes Wanted' rather than stated within the four corners of the advertisement.
> The illegality in this case may be less overt, but we see no difference in the principle here. Sex discrimination in non-exempt employment has been declared illegal under § 8(a) of the Ordinance, a provision not challenged here.

*Id*. at 388-89 (footnote omitted).

*Pittsburgh Press* does not aid Defendants. As this Court has previously held, "the pivotal distinction between the scenario in that case and the issue at hand, is that in *Pittsburgh Press* the illegality was embodied as part and parcel of the prohibited speech. Which is to say, the gender-based placement of the

advertisements for non-exempt jobs was the speech for *Central Hudson* purposes. As such, the advertisements, like the marketing efforts of prostitutes and drug dealers, were intrinsic to their non-protected utterances. In contrast, the speech banned under the Oyster Bay Ordinance targets efforts to solicit employment." [Memorandum and Order, dated June 18, 2013, at p. 22.]

That some of those involved in that activity may endeavor to avoid laws governing zoning, tax, employment, workers' compensation, labor and immigration, [*see* Defs. Opp. Mem. at 29-30] does not render the speech itself unlawful. *See Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013) ("Arizona argues that the day labor provisions are permissible because they regulate speech only when associated with the unlawful activity of blocking or impeding traffic. *Arizona's* proposed rule would be a novel extension of *Central Hudson's* legality requirement, which has traditionally focused on the content of affected speech - i.e., whether the speech proposes an illegal transaction - instead of whether the speech is associated with unlawful activity.").

The ordinance in this case targets efforts to solicit employment, which is not in and of itself illegal. "[I]t is inappropriate to go behind the speech in an effort to discover if the persons communicating - or the recipients of the communications - are likely to satisfy any concomitant legal requirements, though not 'intrinsic' to the solicitation, may, or may not thereafter arise. Such latter considerations are better left to the Internal Revenue Service, Homeland Security and like agencies, rather than inserted into constitutional jurisdiction via 'a novel extension of Central

Hudson's legality requirement.' " [Memorandum and Order, dated June 18, 2013, at p. 23 (quoting *Valle Del Sol, Inc.*, 709 F.3d at 821).]

When the legality of a proposed commercial transaction depends on circumstances outside the content of the speech, the activity is lawful and the speech is entitled to protection under *Central Hudson. See, e.g., Educ. Media Co. at Va. Tech. Inc. v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) (alcohol advertisement in college papers entitled to protection because some readers were of legal drinking age); *Katt v. Dykhouse*, 983 F.2d 690, 697 (6th Cir. 1992) (offer for rebating service entitled to protection even though rebating was illegal in plaintiff's home state because service was to be performed in state where rebating was legal); *National Ass'n of Tobacco Outlets, Inc. v. City of Worchester, Mass.*, 851 F. Supp. 2d 311, 314-16 (D. Mass. 2012) (intrastate advertisement for blunt wrap entitled to protection because blunt wrap sales were lawful in certain parts of the state); *Abilene Retail #?30, Inc. v. Six*, 641 F. Supp. 2d 1185, 1192 (D. Kan. 2009) (advertisement for an adult store entitled to protection because the store sold legal and illegal items); *cf. Alexander v. Cahill*, 598 F.3d 79, 89 (2d Cir. 2010) (concluding that the "*Central Hudson* analysis applies to regulations of commercial speech that is only *potentially* misleading") (emphasis in original); *see generally Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. The

possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." ) (internal quotation marks omitted).[6]

Here, the Ordinance does not purport to address employment involving tax evasion or immigration law violations. It does not mention the "blatant operation of a dangerous and illegal organized labor market." [Defs. Opp. Mem. at 26.] Rather it extends to any individual soliciting employment positioned on property "adjacent to" the Town's streets and sidewalks - even if that individual does not enter the roadway and is a U.S. citizen, who appropriately discloses all his income to federal, state and local income tax authorities, and is the only person in the immediate area on a lightly traveled road with ample parking spaces for any solicited vehicle to lawfully pull over. In other words, it reaches speech that is potentially lawful. To paraphrase the Second Circuit, "the *Central Hudson* analysis applies to regulations of commercial speech that is only *potentially* [unlawful]." *Alexander*, 598 F.3d at 89.

The commercial speech at issue - the roadside solicitation of employment - is lawful activity and thus entitled to First Amendment protection.

### 2. The Proffered Interest is Substantial

*Central Hudson's* second prong requires a substantial interest to be achieved

---

[6] In contrast, the statue upheld in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.489, 496-97 (1982), a case relied upon by Defendants, only targeted the marketing of products "designed or marketed for use with illegal cannabis or drugs" and thus the speech regulated proposed only an illegal transactions as products marketed for legal uses did not fall within the scope of the regulation.

by the restriction.  Defendants justify the Ordinance asserting its intent "to protect the health, safety and welfare of motorists and pedestrians" using the Town's public rights of way "from the traffic and other dangers brought about by street side solicitation."  [Defs. Mem. in Opp. at 32; *see* Ordinance at ¶ A.]  A municipality's interest in  promoting the free flow of traffic, both on streets and sidewalks, is substantial.  *See McCullen*, 134 S. Ct. at 2535; *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (there can be no "substantial doubt that . . . traffic safety and the appearance of the city [] are substantial governmental goals"); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103 (2d Cir. 2010) ("maintaining traffic safety" is a substantial government goal).  Defendants have therefore satisfied *Central Hudson's* second prong.

### 3.    Advancement of the Asserted Interest

*Central Hudson's* third prong requires an examination of whether the Ordinance directly advances the asserted interest in promoting safety on the streets and sidewalks of the Town.  The Town's "burden with respect to this prong 'is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' " *Alexander*, 598 F.3d at 91 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995)).

Defendants have submitted sufficient evidence to meet their burden on this summary judgment motion. The record contains anecdotal evidence from, for example, the Town's Commissioner of the Department of Public Safety regarding his personal observation of traffic congestion caused by day laborers crowding along the drivers' sides of vehicles, the obstruction of motorists' views by the crowding at street corners, vehicles slowing and stopping in moving traffic lanes or double parking in order to engage day laborers in extended discussions, and pedestrians having to walk in the roadway because of the crowds of day laborers on a sidewalk. [Sinnreich Declar. Ex. C.] Defendants also submitted an affidavit and report of Robert Eschbacher, a licensed professional engineer with over 40 years experience in the study, analysis, and design of transportation and roadway projects throughout Long Island and the New York Metropolitan area. [Sinnreich Declar. Ex. I.] That report and affidavit detail the safety issues caused by the congregation of 30-40 individuals along Forest Avenue between 12th and 14th streets and their interaction with vehicles including increasing the potential for rear-end, head-on, and right angle collisions. [*Id*. at Report pp. 5-6; *see also* Disorder at Day Laborer Sites, 2-3 (stating that among the reasons police need to be concerned with day laborer activity are the traffic and parking problems created by large numbers of laborers and contractors).]

Plaintiffs argue that the Ordinance only provides ineffective or remote support because if the solicitation of "employment from drivers of vehicles threaten the health and safety of pedestrians and drivers, then the solicitation of anything

from drivers . . . is equally a threat to health and safety," yet the Ordinance does not preclude other types of solicitation and excludes from its proscription hailing a taxi. [Pls. Mem. at 21.]

Concededly, "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint" and "can also reveal that a law does not actually advance a compelling interest." *Williams-Yulee v. Florida Bar*, – U.S. –, 135 S. Ct. 1656, 1668 (2015) (internal quotation marks omitted). However, the government is not obligated to curtail as much speech as may serve its asserted goal.

> [T]he First Amendment imposes no freestanding "underinclusiveness limitation." A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns, We have accordingly upheld laws - even under strict scrutiny - that conceivably could have restricted even greater amounts of speech in service of their stated interests.

*Id.* (quoting R.A.V. v. St. Paul, 505 U.S. 377 (1992)); *see Anderson v. Treadwell*, 294 F.3d 453, 463 (2d Cir. 2002) (Noting that "in the commercial speech context, the Supreme Court has made clear that underinclusiveness will not necessarily defeat a claim that a state interest has been materially advanced.")

That the Ordinance exempts from its reach service related activities such as taxicabs, limousine service, public transportation vehicles, towing operations, and ambulance service does not diminish its advancement of street and sidewalk safety. The distinction is merely a disparate treatment of commercial speech and it may be reasonable for the Town to believe that these types of employment solicitations do

35

not present an acute problem. *See Metromedia, Inc. v. San Diego*, 453 U.S. 490, 511-512 (1981) (plurality opinion upholding ban on outdoor advertising billboard but permitting onsite advertising signs in which plurality concluded that "city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising"). At best, the Ordinance's exclusion of other types of solicitation raises a question of fact as to whether Defendants have satisfied this third prong.

### 4.     The Ordinance is Not Narrowly Drawn

The inquiry under the fourth prong of the *Central Hudson* analysis is "whether the regulation is more extensive that necessary to serve the governmental interest." *Central Hudson*, 447 U.S. at 566. Alternatively, it been described as requiring that the statute be "narrowly tailored," *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) or that there be a "reasonable fit" between the regulation and the asserted objection, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Alexander*, 598 F.3d at 95.

> The tailoring requirement does not simply guard against an impermissible desire to censor. The government may attempt to suppress speech . . . for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency."

*McCullen*, 134 S. Ct. at 2534-35 (internal quotation marks and citation omitted).

The Ordinance does not meet *Central Hudson's* fourth prong. It regulates more speech than necessary and there are less speech-restrictive alternatives available.

"The dictates of *Central Hudson* do not require a government to adopt the least restrictive means of advancing its asserted interest nor that there be no conceivable alternatives, but only that the regulation not burden substantially more speech than is necessary to further the government's legitimate interest." *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014) (internal citations and quotation marks omitted).

The Ordinance is extremely far-reaching. It defines solicit to encompass "[a]ny request, offer, enticement, or action which announces the availability for or of employment or request, offer, enticement, or action which seeks to offer or secure employment." [Levine Declar. Ex. 1 at ¶ B.] Its examples of soliciting employment include merely "approaching vehicles" or "standing in the public right of way while facing vehicles in the roadway." [*Id*.] Public right of way includes "[a]ll areas dedicated to public use for street purposes" and includes roadways, "medians, sidewalks, curbs, slopes and . . . utility strips." [*Id*.] Further a solicitation is "deemed complete when made whether or not an employment relationship is created, a transaction is completed or an exchange of money or property takes place." [*Id*.] The Ordinance prohibits a pedestrian, "standing within or adjacent to any public right of way" from stopping or attempting to stop a vehicle utilizing the

public right of way for the purpose of soliciting employment. [*Id*. at ¶ C.] Stopping or attempting to stop are undefined and, as Plaintiff's accurately point out, [*see* Pls. Reply at 6 n.2], the Ordinance's definition of solicitation makes clear that the solicitation of employment should be presumed as an attempt to stop a vehicle.

Because of its breath, the ordinance prohibits speech and conduct of an expressive nature that does not pose a threat to safety on the Town's streets and sidewalks. It reaches a lone person standing on the sidewalk, away from the curb, who attempts to make known to the occupants of vehicles his availability for work even if it does not result in a car stopping in traffic or double parking. It reaches children selling lemonade at the end of a neighbor's driveway (which is, after all, "adjacent to" a public right of way), the veteran holding a sign on a sidewalk stating "will work for food," and students standing on the side of a road advertising a school carwash. Even a person standing on the sidewalk holding a sign "looking for work - park at the curb if you are interested in hiring me" would violate the ordinance as it contains no specific intent element and no requirement that the "attempt to stop" result in traffic congestion, the obstruction of other vehicles, or double parking. The Ordinance applies to all streets and roadways in the Town regardless of traffic flow and in the absence of any evidence that the traffic issues the Town relies on to support its interest exist elsewhere in the Town. *See McCullen*, 134 S. Ct. at 2539 ("For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth [of Massachusetts] is hardly a narrow solution.")

As the Ordinance prohibits speech and expressive conduct that may possibly, but not necessarily, pose an actual threat to the asserted interest in protecting the health, safety and welfare of motorists and pedestrians, it fails *Central Hudson's* fourth prong. *Cf. Alexander*, 598 F.3d at 96 (rule restricting attorney advertising fails fourth prong because it "prohibits a category of advertising that is *potentially* misleading, but is not inherently or actually misleading in all cases") (emphasis in original). A governmental entity "may not impose a prophylactic ban . . . merely to spare itself the trouble of 'distinguishing . . . the harmless from the harmful.'" *Id.* at 96 (quoting *Zauderer v. Office of Discip. Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 646 (1985)).

Nor is it any comfort that the Town's safety officers will use their discretion, or be "trained" on how to determine whether a person is soliciting employment or attempting to stop a vehicle to solicit employment. Such discretion may surely invite discriminatory enforcement. *Cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 n.19 ("[B]ecause the distinction between a newspaper and a commercial handbill is by no means clear cut . . . the responsibility for distinguishing between the two carries with it the potential for invidious discrimination of disfavored subjects.") Will safety officers be instructed and/or use their discretion to ignore the students advertising a school car wash and the child selling lemonade on the sidewalk and to ticket the group of Latino men standing on a corner near a home improvement store?

There are a number of less burdensome alternatives available to address street and sidewalk safety. "[T]he existence of numerous and obvious less burdensome alternatives to the restriction on commercial speech is certainly a relevant consideration in determining whether the 'fit' between the ends and means is reasonable." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (quotation marks omitted).

For example, Chapter 173 of the Code of the Town of Oyster Bay, entitled Soliciting and Peddling, contains a section which provides that "[n]o peddler or solicitor shall . . . be permitted to occupy any stationary location in any street or on any public property" and "[n]o person may peddle or solicit in any congested place or an area when or where such activity may impede or inconvenience the public or add to the congestion of such place or area." Town of Oyster Bay Code § 173-4.[7] Section 240.20 of New York's Penal Law proscribes disorderly conduct which is defined to include obstructing vehicular or pedestrian traffic or congregating with other persons in a public place and refusing to comply with a lawful order of the police to disperse. N.Y. Penal Law § 240.20(5), (6). New York's Vehicle and Traffic Law ("VTL") contains provisions requiring pedestrians to yield the right of way to vehicles, N.Y. Veh. & Traf. Law §1152, as well as prohibiting (1) standing in a roadway to solicit from or sell to any occupant of any vehicle, *id.* §1157; (2)

_____

[7] Parenthetically, the Court notes that Chapter 173 makes it "the duty of all duly authorized peace officers and of any police officer of the county to enforce" its provisions.

pedestrians from walking along and upon an adjacent roadway where sidewalks are provided, *id*. §1156; (3) stopping, standing or parking a vehicle on the roadway side of a stopped or parked vehicle, on a crosswalk or within an intersection, *id*. §1202; (4) driving at such a slow speed as to impede the normal and reasonable movement of traffic, *id*. §1181. Defendants response to these other avenues is unpersuasive and fails to raise even a question of fact as to narrow tailoring.

Defendants' argument that VTL § 1152 appears to be solely for the purposes of establishing contributory negligence is underwhelming. Section 1800 of the VTL makes it a traffic infraction to violate any provision of Chapter 71, which chapter includes all the VTL sections cited above, punishable by fine and/or imprisonment. N.Y. Veh. & Traf. Law §1800.

Defendants disassociate each of these laws from the others in an effort to demonstrate how each individual law fails to address all of the Town's concerns. For example, they assert that VTL § 1157(a) is insufficient because it only address persons actually standing in the roadway and not adjacent thereto or on the sidewalks. This ignores, however, the availability of other statutes, such as Chapter 173 of the Town's Code and Section 240.20 of the Penal Law, to address such issues. In other words, there need not be one law that addresses all of the government's concerns. In determining the fit between the ends and the means, a Court may consider the full panoply of less burdensome alternatives, both actual and potential. *See, e.g., Valle De Sol*, 703 F.3d at 827 ("our consideration is not limited to Arizona's actual traffic safety regulations, but includes any potential or actual

traffic safety regulations that are obviously available") ("[n]othing in the record shows that Arizona could not effectively pursue its interest in traffic safety by enforcing or enacting similar kinds of speech-neutral traffic safety regulations"); *Redondo Beach*, 657 F.3d 949-50 (identifying numerous existing laws that could address the concerns attending in-street employment solicitation without implicating speech).

The availability of these laws as less burdensome alternatives is unaffected by Defendants' argument that its does not have the legal authority to enforce the VTL or Penal law as it does not have a separate police department and such enforcement is outside the jurisdiction of its public safety department. The Town is part of the Nassau County Police District and has a right to expect that department to enforce all laws within the Town's confines. *See* Nassau County Admin. Code § 8-22.0 (listing the duties of the police department, including preserving the peace, detecting and arresting "offenders," removing nuisances in public roadways, regulating the movement of vehicular traffic and "[e]nforc[ing] and prevent[ing] the violation of all laws and ordinances in force in such district . . . ") That there may exist issues between the Town and the police department does not preclude consideration of less speech-burdensome alternatives. Also, Defendants fail to explain the jurisdiction of its public safety department and why that jurisdiction is insufficient to address the Town's concerns in a manner less burdensome to speech than the Ordinance.

Defendants also assert that existing laws, while perhaps sufficient to address

the isolated incidence of a car double parking or an occasional individual running into the street, the problem facing the Town arises out of the "organized, systematic, daily marketplace . . . which results in the disruption of vehicular and pedestrian traffic on a regular and ongoing basis." [Defs. Opp. Mem. at 37.] Defendants do not explain, however, why these laws are insufficient to address the "regular and on going" disruption to vehicular and pedestrian traffic.  Indeed, common sense dictates that, in these circumstances, it would be easier to enforce laws against an organized systematic, daily occurrence rather than on a "catch as catch can" basis.

Laws that limit commercial speech may not be more extensive than necessary to serve a substantial interest.  As Defendants have not sustained their burden under Central Hudson's final, "narrowly tailored" prong, Plaintiffs are entitled to summary judgment on the claim that the Ordinance is violative of the First Amendment.[8]

## CONCLUSION

The aggressive solicitation of employment from occupants of motor vehicles, without question, raises valid concerns about the dangers that can arise therefrom. The Town's response to these concerns - the Ordinance - is not, however, a constitutionally permissive one.  Like a number of the community members who

---

[8]  Having determined that the Ordinance does not withstand scrutiny under the First Amendment, the Court need not address Plaintiffs' Due Process and Equal Protection claims.

spoke at the Town's March 31, 2009 and May 26, 2009 public hearing, the Court urges the parties to this case to seek a safe, constitutionally valid solution to address these concerns.

Plaintiffs' motion for summary judgment is granted.

**SO ORDERED.**

Dated: Central Islip, New York
     September  3, 2015                   <u>/s/ Denis R. Hurley  </u>
                                           Denis R. Hurley
                                           United States District Judge